IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

C.G., by and through her Parents,          :
Jim G. and Beth G.                         :
of Wilmington, Delaware                    :          Civil Action
                Plaintiffs          :
       v.                     :          No.
                                   :
BRANDYWINE SCHOOL DISTRICT                 :
1311 Brandywine Boulevard,                 :
Wilmington, Delaware 19809                 :
                                   :
           Defendant             :

## COMPLAINT

**I.     Introduction**

1.      This action is brought by Chloe G., a minor child with disabilities, and her parents Jim G. and Beth G. ("Plaintiffs" or the "Family"), against Defendant Brandywine School District (the "District") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*; the federal and state implementing-regulations of the foregoing statutes; and 14 Del. Admin. C. § 922 *et seq.*

2.      Chloe is a young lady with Autism whose parents were forced to place her at the White Clay School after the District failed for years to provide her with an appropriate education. After fully considering the entire record, this Court should determine that the Defendant violated the foregoing statutes, reverse the Hearing Panel's decision, and award appropriate relief to the Family, specifically, tuition reimbursement for Chloe's 2020-2021 school year at the White Clay School, reasonable attorneys' fees and costs, and any other relief this Court deems just.

## II.    **Parties**

3.    Chloe was born in 2009 and at all relevant times resided in Wilmington, Delaware with her Parents and within the geographical boundaries of the Defendant School District. Chloe is a student with disabilities as defined under IDEA with a disability classification of Autism, and a Protected Handicapped Student under Section 504 and the ADA.

4.    The District is located at 1311 Brandywine Boulevard Wilmington, Delaware 19809. The District is the recipient of several sources of federal funds and is an educational agency designated by Delaware law and the Delaware Department of Education for the provision of educational services to individuals residing within its boundaries; such services include those mandated under IDEA as well as Delaware's statutory/regulatory scheme concerning young children with disabilities, 14 Del. Admin. C. § 922 *et seq.*

## III.    **Procedural History**

5.    Chloe was enrolled and attended school in the District from kindergarten (the 2015-2016 school year) until the end of third grade (the 2018-2019 school year). She is identified as an eligible student with disabilities under IDEA with a disability classification of Autism.

6.    On July 30, 2021, the Family filed a Special Education Due Process complaint against the District for tuition reimbursement, an equitable remedy available under IDEA and Section 504, for Chloe's fifth grade year (the 2020-2021 school year).

7.    Following an evidentiary hearing held over Zoom on September 27, 29, and 30, 2021, an administrative Hearing Panel issued a written decision on November 5, 2021, denying the Family relief.

8.    The Family now appeals to this Court and respectfully requests the Court reverse the Hearing Panel's decision and award appropriate relief to Chloe and the Family.

**IV.**    **Jurisdiction and Venue**

9.    This Court has original jurisdiction over this appeal pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the IDEA, Section 504, and the ADA.

10.    Plaintiffs have exhausted their administrative remedies where required under IDEA (20 U.S.C. § 1415(i)), having timely pursued a Special Education Due Process hearing. Neither Section 504 nor the ADA require the exhaustion of administrative remedies and in Delaware, the Department of Education does not permit parents to raise administrative claims under Section 504 or the ADA alongside an IDEA claim; thus, the Plaintiff's state due process complaint only referenced IDEA. Absent an ability to raise Section 504 or ADA claims at a state administrative hearing, those claims are appropriately raised for the first time to this Court.

11.    Plaintiffs' claims and remedies are authorized by 20 U.S.C. § 1415 and 28 U.S.C. §§ 2201 and 2202, providing for declaratory and any further relief deemed necessary and proper.

12.    All of the Defendant's actions have taken place within the jurisdiction of the United States District Court for the District of Delaware. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391.

**V.**    **Standard of Review**

13.    This Court is required to undertake a fully independent review of the record and the hearing officer's decision. *Rowley v. Board of Educ.*, 458 U.S. 176, 206-07, 102 S.Ct. 3034 (1982).

14.    In conducting this independent review, district courts: (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. 20 U.S.C. § 1415(i)(2)(B).

15.     The Third Circuit requires "a district court to apply a nontraditional standard of review when considering an appeal from a state administrative decision under IDEA" called modified de novo review. *Mary T. v. School District of Philadelphia*, 575 F.3d 235, 241 (3d Cir. 2009).

16.     Under modified de novo review, district courts shall accord "due weight" to the factual findings of the administrative agency. *S.H. v. School District of Newark*, 336 F.3d 260, 269 (3d Cir. 2003). "Due weight" means that although the district courts must consider the administrative fact findings, the courts are free to reject such findings. *Id.* at 269-70.

17.     Thus, when reviewing an administrative proceeding in an IDEA case, the district court should "defer to the hearing officer's factual findings," unless it can point to contrary non-testimonial extrinsic evidence in the record. *Carlisle Area School District v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995).

18.     Should the Court choose not to accept these factual finding it is obliged to explain why. *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004)

19.     Modified de novo review does not apply to Section 504 and ADA claims. *K.N. v. Glouster City Bd. Of Edu.*, 379 F.Supp.3d 334, 344 (D.N.J 2019). Thus, a federal district court applies a de novo standard of review for the Section 504 and ADA claims. *Id.* (*citing T.F. v. Fox Chapel Area Sch. Dist.*, 589 F.App'x 594, 598 (3d Cir. 2014)).

## VI.   Applicable Law

### A.   IDEA requires that a school district identify all children with disabilities who live in the district and conduct a special education evaluation.

20.     The purpose of the IDEA is to ensure that "all children with disabilities have available to them a free appropriate public education ("FAPE") that emphasizes special education

and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

21.    After a child is determined to be eligible, IDEA and its regulations provide for periodic reevaluations, which "may occur not more than once a year unless the parent and public agency agree otherwise; and must occur at least once every three years, unless the parent and the public agency agree that an evaluation is unnecessary." 20 U.S.C. § 1414(a)(2)(B)(i), (ii); *see also* 34 C.F.R. §300.303(b).

22.    School districts, however, also have the obligation to "ensure that a reevaluation of each child with a disability is conducted" at any time "the public agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; or if the child's parent or teacher requests a reevaluation." 20 U.S.C. §1414(a)(2)(A)(i), (ii); 34 C.F.R. 300.303(a).

23.    According to IDEA, school districts must, at a minimum, evaluate students with disabilities at least every three years, commonly known as a "triennial evaluation." 34 C.F.R. § 300.303(b)(2).

24.    In such evaluations, a school district must use a variety of assessment strategies to gather relevant information about the child, and must assess the child "in all areas related to the suspected disability." 34 C.F.R. § 300.304(c)(4).

25.    The public agency must ensure that a student's "evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304(c)(6).

26.    Despite the pandemic, the United States Department of Education did not waive

requirements that public school districts provide FAPE to students with disabilities. *See Questions and Answers on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak*, March 2020, available at, <https://sites.ed.gov/idea/idea-files/q-and-a-providing-services-to-children-with-disabilities-during-the-coronavirus-disease-2019-outbreak/#Q-A-1>.

27.     Public school districts' ongoing FAPE requirement also includes evaluating and obtaining the necessary data for   progress monitoring and Independent Educational Program ("IEP") development. *See id.*

**B.     After the school district identifies a student's needs in an evaluation report, the IEP Team must use the report to create an IEP and offer a student a Free Appropriate Public Education.**

28.     At the beginning of each school year, a school district is required to develop an IEP that provides a FAPE for each child with a disability who resides within its jurisdiction. 20 U.S.C. § 1414(d)(2)(A).

29.     Because a school district's obligation to offer FAPE derives from the child's residency in the community, even disabled students in private schools must be offered an IEP, and enrollment is not required to trigger the mandatory obligation to provide an offer of FAPE. *Shane T. v. Carbondale Area School District*, 2017 WL 4314555 at *9 (E.D.Pa. February 24, 2020); *see also I.H. v. Cumberland Valley School Dist.*, 842 F. Supp.2d 762, 772-73 (E.D. Pa. 2012) ("requiring enrollment as a prerequisite to obtaining an IEP . . . would be at odds with the 'remedial nature' of the IDEA").

30.     A resident child eligible for special education services is entitled to an offer of FAPE upon parent's request. *L.T. v. North Penn School District*, 2018 WL 6600206 at *7 (E.D.Pa. December 14, 2018). If that resident child is attending a privately-funded program, the child still has the right to an offer of a FAPE via a thorough evaluation and a proposed IEP. *Shane T.*, *supra*,

2017 WL 4314555 at *9.

31.    The IDEA provides that an IEP team, which includes both school officials and the child's parents, must develop an appropriate educational program and placement for each eligible child through an IEP. A two-pronged analysis applies in reviewing a school district's IEP development under the IDEA: (1) whether the District complied with the procedures set forth in the IDEA; and (2) whether the IEP developed through the IDEA's procedures is reasonably calculated to enable the child to receive meaningful educational benefit. *Board of Educ. v. Rowley*, 458 U.S. 176, 206-07, 102 S.Ct. 3034 (1982); *see also Endrew F. v. Douglas County School District RE-1*, ___U.S. ___, 137 S. Ct. 988, 999 (2017).

32.    The IDEA requires that every IEP include a statement of the child's present levels of academic achievement and functional performance; a statement of measurable annual goals; a description of how the child's progress toward meeting the annual goals will be measured and when periodic reports on the progress the child is making toward meeting the annual goals will be made; a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child; a statement of the program modifications or supports for school personnel that will be provided to enable the child to advance appropriately toward attaining the annual goals, to be involved in and make progress in the general education curriculum; and an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in activities. 20 U.S.C. §1414(d); 34 C.F.R. § 300.320.

33.    The United States Supreme Court in its decision in *Endrew F.*, *supra*, emphasized that IDEA requires more than a program reasonably calculated to allow a student to make "some progress." *Endrew F.*, 137 S. Ct. at 997, 1000-01. Instead, IDEA "requires an educational program

reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999.

34.     In addition, an "educational program must be appropriately ambitious in light of his circumstances," as minimal "progress from year to year can hardly be said to have been offered an education at all. The goals may differ, but every child should have the chance to meet challenging objectives." *Id.* at 999-1000.

35.     The progress standard set forth in *Endrew F.* is therefore consistent with, and expands upon, the standard that has been applied for many years in this Circuit, requiring that a student must receive a program that is reasonably designed to allow a student to make *meaningful* educational progress and achieve "significant learning." *Brandywine Heights Area School Dist. v. B.M.*, 248 F. Supp.3d 618, 632 (E.D. Pa. 2017).

36.     Furthermore, it is well-settled that "education" extends beyond discrete academic skill, and includes the social, emotional, behavioral, and physical progress necessary to move the child toward meaningful independence and self-sufficiency consistent with the child's cognitive potential. *M.C. v. Central Regional School District*, 81 F.3d 389, 393-94 (3d Cir. 1996); *see also Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 181-82 (3d Cir. 1988).

   **C.     A school district is required to reimburse a parent for private school tuition where the district failed to offer an appropriate IEP and where the private school placement was appropriate.**

37.     The Supreme Court established that when a school district's IEP is inappropriate, and when the parents obtain and pay for an appropriate private school program along with other equitable considerations, the school district must fund the private program provided by the child's parents. *School Comm. of Burlington v. Dept. of Educ. of Massachusetts*, 471 U.S. 359, 370-71, 105 S.Ct. 1996 (1985); *see also Florence County School Dist. v. Carter*, 510 U.S. 7, 14, 114 S.Ct.

361 (1993); 34 C.F.R. § 300.148(c).

38.     As such, under IDEA, parents who disagree with their child's program and placement at a school district may unilaterally enroll their child in an appropriate out-of-district placement and obtain tuition reimbursement where a court determines that the school district has not offered an appropriate education for the child. *Shore Reg'l High School Bd. of Educ. v. P.S.*, 381 F.3d 194, 198-99 (3d Cir. 2004).

39.     Under the test for tuition reimbursement from *Burlington, supra*, a court's first step is to determine whether the school district offered the student FAPE through an appropriate IEP. *Burlington*, 471 U.S. at 369-70.

40.     The Third Circuit has held that a court examines an IEP for appropriateness at the time it was proposed. *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564-55 (3d Cir. 2010); *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031 (3d Cir. 1993). The Second Circuit is aligned with the Third Circuit's holding that retrospective testimony that "materially alters the written IEP" should not be considered in determining whether FAPE was offered. *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 187 (2d Cir. 2012). The Tenth Circuit agrees. *Sytsema ex rel. Sytsema v. Academy School Dist. No. 20*, 538 F.3d 1306, 1315 (10th Cir. 2008) (holding that in determining whether draft IEP was appropriate, a court should consider only the written IEP, not representations made at subsequent meetings).

41.     After examining the written IEP, the court must determine whether the private school was appropriate. *Burlington*, 471 U.S. at 369-70.

42.     The private school does not need to be the least restrictive environment, nor is it held to the same FAPE standards as the school district. *Florence County, supra*, 510 U.S. at 13-14.

43.    Tuition reimbursement for a family's unilateral decision to place a child in a private placement is appropriate if "the [school district] has not made free appropriate education available to the child in a timely manner prior to that enrollment." *Norristown Area School District v. F.C.*, 636 Fed. Appx. 857 (3d Cir. 2016) (not precedential).

44.    Once a court determines a placement is appropriate, the court may still reduce the tuition reimbursement if the court finds that an equitable reduction is necessary after examining (1) whether the parents informed the school district of their intent to remove the student, (2) whether the parents made their child unavailable for a reevaluation, or (3) whether the parents otherwise acted unreasonably. 34 CFR §300.148(d).

**D.    A student may also bring a tuition reimbursement claim under Section 504 and the ADA.**

45.    Under Section 504, recipients of federal funds such as the District are required to "provide a free appropriate public education [FAPE] to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a). The term "appropriate education" is defined as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of the handicapped persons as adequately as the needs of non-handicapped persons are met and (ii) are based on adherence to the procedures that satisfy the requirements of Section 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b).

46.    Similar to IDEA, Section 504 and its regulations require the identification of all children with disabilities and the provision of appropriate educational services. 29 U.S.C.§ 794; *see also* 34 C.F.R. § 104.1 *et seq.*

47.    Section 504 requires that "a public elementary or secondary education program

shall annually undertake to identify and locate every qualified handicapped person residing in the recipient's jurisdiction who is not receiving a public education and take appropriate steps to notify handicapped persons and their parents or guardians of the recipient's duty under this subpart." 34 C.F.R. § 104.32; *see also Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 253 (3d Cir. 1999).

48.     "When a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA.  However, it also violates [Section 504] because it is denying a disabled child a guaranteed education merely because of the child's disability. It is the denial of an education that is guaranteed to all children that forms the basis of the claim." *Andrew M. v. Delaware Cty. Office of Mental Health and Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007).

49.     Thus, the substantive requirements of Section 504 in the education context are largely, but not entirely, equivalent to the requirements under the IDEA. *James S. v. School Dist. of Phila.*, 559 F. Supp.2d 600, 620 (E.D. Pa. 2008).

50.     A school may violate Section 504 independent of any violations of IDEA. *See Lauren G. v. West Chester Area School Dist.*, 906 F.Supp.2d 375 (E.D.Pa. 2012) (granting tuition reimbursement for school district's failure to provide FAPE under Section 504 during period for which no relief was granted under IDEA).

51.     To establish a violation of Section 504, a plaintiff must prove that: (1) he is "disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school. *Ridgewood*, 172 F.3d at 253.

52.     Tuition reimbursement is an available remedy under Section 504, as well as under IDEA. *Molly L. v. Lower Merion School Dist.*, 194 F.Supp.2d 422, 429 n.7 (E.D.Pa. 2002)

("Tuition reimbursement has been awarded in cases arising under both the Rehabilitation Act and IDEA.").

53.    The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." The Third Circuit has held that the ADA "extends the nondiscrimination rule of [Section 504] to services provided by any 'public entity' (without regard to whether the entity is a recipient of federal funds)." *Jeremy H. v. Mount Lebanon School Dist.*, 95 F.3d 272, 279 (3d Cir. 1996). That court held that "the remedies, procedures, and rights" applicable to Section 504 claims are the same as those under the ADA. *Id.*; *see also Tereance D. v. School Dist. of Philadelphia*, 548 F. Supp.2d 162, 169-70 (E.D.Pa. 2008) (applying same analysis to claims under ADA as to claims under Section 504).

54.    The IDEA, Section 504, and the ADA all permit the recovery of reasonable attorneys' fees by parents who prevail in an action or proceeding thereunder. 20 U.S.C. § 1415; 42 U.S.C. § 12205; 34 C.F.R. § 300.517; 29 U.S.C. § 794a.

## VI.    **Factual History**

55.    Plaintiffs incorporate by reference the preceding paragraphs.

56.    Before attending White Clay, Chloe's social-emotional functioning and maladaptive behaviors were key impediments to her academic success. Her last year in the District (2018-2019) was her most difficult. By February of 2019, Chloe's behaviors increased to a level that required a crisis plan. These behaviors continued and it became necessary for the IEP team to add behavior goals and consider educating her in a more restrictive environment.

57.    While attending school in the District, she also struggled academically, most

notably in mathematics.

58.    Because the District's educational program did not meet Chloe's educational needs and because Chloe's maladaptive behaviors and anxiety were increasing, her parents enrolled her at the White Clay School ("White Clay" or "Private School") at the start of the 2019-2020 school year.

59.    White Clay is a therapeutic-based, accredited private school that creates a custom program for each child. It is designed to serve children diagnosed with mild to moderate learning disabilities and who are experiencing needs in attention, anxiety, behavior, and executive functioning.

60.    The Parents did not seek reimbursement for the 2019-2020 school year because the Parents paid for it using compensatory education from a previous settlement of a claim related to the provision of special education to Chloe.

61.    White Clay was appropriate for Chloe and met her educational needs during her fourth-grade year (2019-2020); nevertheless, Chloe's Parents remained interested in an appropriate public school placement for Chloe for fifth grade (2020-2021). On June 20, 2020, Parents emailed the District in an attempt to determine whether the District would offer an appropriate educational placement for Chloe.

62.    On June 26, 2020, the District advised Parents that it needed an updated educational reevaluation in order to create an IEP for Chloe and requested a release from the Parents so that the District could contact White Clay and obtain Chloe's educational records from White Clay. The Parents returned the executed release on June 29, 2020.

63.    On July 1, 2020, the District emailed the Parents a Permission to Evaluate ("PTE") form, which the Parents executed and returned on July 6, 2020.

64. The District conducted a psychoeducational evaluation on July 21 and 22, 2020; a speech and language evaluation on July 28, 2020; and an occupational therapy evaluation on August 10 and 11, 2020.

65. Meanwhile, on August 5, 2020, the Parents timely sent the required written notice to the District indicating their intent to place Chloe at White Clay and requesting that the School District fund Chloe's tuition.

66. On August 11, 2020, the District emailed the Parents a Notice of an IEP meeting scheduled on September 2, 2020, along with a Parent Input Form.

67. In response, the Parents advised the District that the first day of school at White Clay was August 19, 2020, but that the Parents would still attend the September 2, 2020 IEP meeting so that the Parents could consider the District's proposed IEP.

68. When Chloe began her school year at the White Clay School on August 19, 2020, the Parents had not received a draft IEP from the District and thus had no guarantees concerning Chloe's educational programming in-District.

69. On August 26, 2020, the District finally contacted the White Clay's Behavioralist to request data concerning Chloe's behavioral needs at White Clay.

70. The District did not contact White Clay for this updated behavioral data until August 26, 2020, seven days after Chloe started at White Clay and only one week before the September IEP meeting.

71. The District did not receive a response from White Clay or confirmation the request was received; yet the District did not follow up with White Clay until January 2021. At this point the behavior data was outdated and obviously could not have been used to support the District's offer of programming in the September 2, 2020 IEP.

72.     The District did not observe Chloe in her classroom in July 2020 during the Extended School Year program at White Clay to independently gather behavioral data though it could have done so.

73.     Based on the parent-executed Permission to Evaluate, the District was able to conduct any evaluation necessary to complete its evaluation of Chloe, yet it failed to do so.

74.     The parties held an IEP meeting on September 2, 2020; there, the District rejected the Parents' request that it fund Chloe's education at White Clay.

75.     The District's IEP did not provide a plan for Chloe's transition from private school to public school. Chloe struggles with changes in routine and a change in school would have likely coincided with an increase in behaviors and anxiety. Yet, there was simply no plan for properly transitioning Chloe to address this likely spike in maladaptive behaviors and the impact these behaviors would have on her education.

76.     The IEP did not contain an updated behavior support plan; rather, it merely used the behavior support plan from the Student's education at White Clay.

77.     The District's behaviorist candidly testified she could not create a behavior support plan because she did not have any behavioral data on which to base it. She advised that she needed about three weeks of data to create the behavior plan; however, she and the District ignored the fact that Chloe was in school during the month of July and the District simply neglected to collect the data then.

78.     The IEP meeting was September 2, 2020, a few days before the school year was set to begin, yet the District could not explain to the family how Chloe's IEP would be implemented through remote learning, which was how the 2020-2021 school year started in the District.

79.     In addition to the concerns about the lack of behavioral and mental health support,

the Parents also had concerns with the level of academic support and related supports recommended by the District in the September 2, 2020 IEP.

80.    For math, the District was recommending that Chloe only receive direct instruction for ten to fifteen minutes per day, which is insufficient to address Chloe's most difficult subject.

81.    Furthermore, the math goals concerned skills that Chloe already mastered according to White Clay.

82.    For reading comprehension, the goals did not target a mastery level. A mastery level is 90 percent correct before moving on to new material. Here, there are multiple goals in Chloe's IEP that do not work to this level.

83.    Chloe's program had insufficient instruction on socialization skills; more specifically, there were no opportunities in the IEP for Chloe to receive social skills instruction to build social skills in unstructured settings, such as lunch or recess.

84.    Furthermore, the District proposed a "B" setting in Chloe's IEP, which is supposed to mean that Chloe would be in the general education setting more than 40 percent but less than 79 percent of her day. However, the testimony of the District revealed that this representation in the IEP was not accurate.

85.    At the hearing, the District presented testimony that Chloe's placement was "fluid," meaning her time in the special education classroom could increase or decrease depending on the level of support Chloe and her providers felt she needed during a given time and, critically, without the Parents' consent. This testimony fundamentally altered the proposed placement offered by the District in its IEP.

86.    This "fluid" or "flexible" approach to Chloe's placement was not in Chloe's IEP, but only came to light during testimony by District witnesses at the due process hearing.

87.    Thus, the educational placement offered by the District in the IEP may or may not have been Chloe's actual educational placement in the District.

88.    After considering the IEP, as written and presented on September 14, 2020, the Parents, via email, rejected the IEP and again requested funding for Chloe's tuition at the White Clay School.

89.    Both the testimony and White Clay's records indicate that Chloe made progress there academically, socially, and emotionally.

90.    Upon her entry, White Clay conducted assessments of Chloe, which indicated that she was behind grade level in reading, struggled greatly with her mental health, and her maladaptive behaviors significantly impeded her learning.

91.    Chloe is now on grade level in reading.

92.    Her academic improvement extends to writing skills, math skills and, most notably, her behavioral and social-emotional functioning. Her disruptive behaviors have decreased, she is no longer physically aggressive, and she has improved her peer relations. Her math skills have progressed from a third grade level to a fourth grade level.

93.    Given Chloe's needs in math, it is not surprising that she has yet to achieve grade level skills in mathematics, but is a large improvement from when she was in the District and would refuse to attend math class.

94.    According to Chloe's mother, there is no more school refusal, Chloe expresses a renewed enjoyment of school, now has friends and gets invited to birthday parties, and exhibits less disruptive behavior in school, resulting in more instructional time.

95.    This progress is sufficient to show White Clay is an appropriate educational placement for Chloe.

96.    Finally, the District did not present any evidence concerning an equitable reason to reduce a tuition reimbursement award. The Family timely contacted the District (in June 2020) to explore returning Student to the District for the 2020-2021 school year. The Family completed all necessary paperwork; signed the necessary releases for the District to evaluate the Student and obtain records from outside providers; made Chloe available for testing; and participated in the IEP meeting on September, 2, 2020.

**VII.    The Hearing Panel's Errors**

97.    The Plaintiff incorporates by reference the preceding paragraphs.

98.    The Panel erred by concluding that the District offered Chloe FAPE through its September 2, 2020 IEP. That IEP was not offered until after Chloe started at White Clay. As described below, the IEP was not supported by a comprehensive evaluation of all suspected areas of need, namely her social, emotional, and behavioral needs; did not contain a Behavior Support Plan; did not provide for a sufficient amount of special education instruction in math; did not contain measurable, ambitious goals; and did not even guarantee the amount of special education Chloe would receive.

99.    The District unquestionably failed in its statutory duties to Chloe and the Hearing Panel erred in ruling otherwise and in failing to award tuition reimbursement as relief.

100.    The IEP was not a lawful offer of FAPE because the School District failed to comprehensively evaluate Chloe or otherwise obtain appropriate updated and current data from White Clay before drafting the IEP.

101.    The COVID-19 pandemic did not relieve the District of its legal obligation to evaluate Chloe, or otherwise obtain updated data.

102.    Because it did not conduct a timely, comprehensive evaluation of Chloe, including

obtaining updated behavioral data and conducting a classroom observation, the District offered an inappropriate IEP that did not provide a FAPE.

103.    The Panel found that on August 11, 2020, the Parents first told the District of the start date at White Clay, inferring incorrectly that the Parents were required to inform the District of the first day of school at an earlier date. At this point, the District had a month and a half to evaluate Chloe, collect behavioral date, observe Chloe, and offer an IEP; yet, the District failed in each of these respects. The fact that the Parents' reminded the District that White Clay was getting ready to start was gratuitous—they had no legal obligation to do so. And in any event, the start date is public information that the District could have discovered by calling White Clay or visiting its website.

104.    The Parents were required by IDEA to inform the District of their intent to place their child in a private school within 10 days of the start of school and the District was required to offer an IEP before the start of school. Here, the Parents were simply reminding the District that White Clay was starting.

105.    School districts are required to evaluate all areas of suspected need, which the District failed to do here. When the Student's family contacted the District in June 2020 about returning the Student to the District, the District wanted to collect updated information on Student's needs and issued a permission to evaluate form, which the Parents promptly signed and returned.

106.    This deficient IEP can be traced to this failure to properly evaluate and collect necessary behavioral data during the summer before the 2020-2021 school year. This failure led the District to create an inadequate and inappropriate behavior support plan. It was uncontested that the District needed this behavior data but it made no effort to obtain this data independently.

107.    The Panel concluded that the District's draft behavior support plan ("BSP")—which was not supported by updated data and which was a regurgitation of White Clay's plan—did not deny Chloe FAPE. Ignoring their own audacity, the Panel concludes that "[i]t is disingenuous for the Parents to argue that the absence of a final BSP (which was in large part still in draft because White Clay failed to provide data, and the District did not have sufficient time or opportunity to collect their own) was reason to reject the IEP." Neither White Clay nor the Parents had a statutory obligation to provide behavioral data; rather, the District had a statutory obligation to collect the behavior data over the summer while Chloe was in school, or, in the very least, the District had the obligation to follow-up with White Clay and obtain White Clay's data. The reality is that the District was negligent; yet, the Hearing Panel relieves them of their obligation to provide FAPE by pointing the finger at the Parents and White Clay.

108.    The IEP contained math goals that Chloe already mastered and reading goals that did not target a mastery level.

109.    The IEP failed to include a contingency plan in the event the District moved to virtual instruction, which immediately occurred.

110.    The "flexibility" of Chloe's placement is such that there is no certainty that Chloe would have received the amount of special education delineated in her IEP. Her IEP stated she would be in a "B" setting, which means she would be in the general education classroom between 40 percent to 79 percent of the day; this is referred to as a "supplemental" placement. However, Chloe could have spent enough time in this special education placement that it would turn her placement into a "C" setting (meaning that she would be in the general education setting less than 40 percent of her day); alternatively, she could spend so little time in the special education classroom that her placement could turn into an "A" setting (meaning she would be in the general

education classroom for more than 79 percent of the day).

111.    It was possible for Chloe to return to the District and never receive the "B" setting listed in her IEP. This "flexibility" devalued the placement recommendation contained in Chloe's IEP and was so vague that it rendered the IEP inappropriate.

112.    The "flexibility" also constitutes a random and unlawful unilateral change in placement because Chloe could have been in the special education setting for longer or shorter than stated in the IEP, and this change would occur without parental participation.

113.    In addition, it was legal error for the Panel to consider testimony concerning Chloe's placement that differed from the placement described in the four corners of the written IEP. When determining whether tuition reimbursement is warranted, a hearing panel or federal court is only permitted to examine the written IEP, which, here, did not reference a "flexible" special education placement.

114.    The Hearing Panel found that the IEP did not provide a "breakdown . . . as to which classes [Chloe] would attend in the special education classroom versus the general education classroom and environment[,]" and that during the September 2, 2020 IEP meeting the District was unable to provide any answers to the Parents when they asked for clarification as to when their child would be in the special education classroom. Remarkably, the Panel concluded the failure to guarantee when Chloe would be in the special education classroom was not a denial of FAPE.

115.    A parent cannot make an informed choice as to the appropriateness of a placement if they do not know how much time their child will be in the special education classroom.

116.    Having established that the District failed to offer Chloe a FAPE during the 2020-2021 school year, the Family unmistakably fulfilled the first prong of the *Burlington/Carter* tuition reimbursement analysis, and the Hearing Panel erred in concluding to the contrary.

117.    Because the Hearing Panel mistakenly found that the District offered Chloe a FAPE for the school year at issue, the Panel did not consider the two additional prongs of the tuition reimbursement analysis: the appropriateness of the Private School, and whether the equities call for any reduction in the tuition award; however, it is clear that the Parents met their burden of proof regarding these prongs as well.

118.    As described above, the evidence demonstrated that the White Clay School is an appropriate placement for Chloe.

119.    There is no equitable reason to reduce a tuition reimbursement award.

120.    The Family contacted the District in June 2020 to explore returning Student to the District for the 2020-2021 school year.

121.    The Family completed all necessary paperwork and signed the necessary releases for the District to evaluate the Student and obtain records from outside providers.

122.    The Family made Chloe available for testing.

123.    The Family participated in the IEP meeting on September, 2, 2020.

124.    Because the Family met the third prong of the tuition reimbursement analysis, there is no equitable basis to reduce or deny tuition reimbursement.

125.    The District's failure to offer Chloe a non-discriminatory, appropriate educational environment resulted in her being excluded from participation in, denied the benefits of, or subject to discrimination in, her education in violation of not only IDEA, but Section 504 and the ADA as well.

126.    The Hearing Panel therefore erred in not awarding tuition reimbursement under not only IDEA, Section 504 as well.

**WHEREFORE**, the Plaintiffs respectfully request that this Court:

      1.    Assume jurisdiction over this action;

      2.    Hear additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii);

      3.    Reverse the Hearing Panel's Decision and award the Family tuition reimbursement and related costs for 2020-2021 school year at the White Clay School;

      4.    Order the Defendant to pay Plaintiffs their reasonable attorneys' fees and related costs;

      5.    Declare the Defendant's actions and omissions to be violative of IDEA, Section 504, ADA; and Delaware law; and

      6.    Grant such other relief as this Court deems proper.

Respectfully submitted,

*Alexander T. Corbin*

Alexander T. Corbin, Esquire
Delaware ID No. 6145
McANDREWS, MEHALICK, CONNOLLY,
HULSE and RYAN, P.C.
910 Foulk Road
Suite 200
Wilmington, DE  19803-3159
Tele: 302-380-4975
Attorney for Plaintiffs