IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

C.G., by and through her Parents,
Jim G. and Beth G. of Wilmington,
Delaware,

                        Plaintiffs,

            v.

BRANDYWINE SCHOOL
DISTRICT,

                        Defendant.

Civil Action No. 22-152-CFC

---

## MEMORANDUM

C.G., by and through her parents, (collectively, Plaintiffs) brought this civil action against the Brandywine School District (the District).  Plaintiffs allege that the District failed to provide C.G. a free appropriate public education (FAPE) as required by the Individuals with Disabilities Education Act (IDEA or the Act), 20 U.S.C. §§ 1400–1482.  Plaintiffs further allege discrimination in violation of § 504 of the Rehabilitation Act, 29 U.S.C. § 794; the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*; and 14 Del. Admin. Code § 922, *et seq.*   D.I. 1 at 1.

This action follows a decision of a Delaware Department of Education Due Process Panel (the Panel) in favor of the District.  Pending before me are cross-

motions for judgment on the administrative record.  For the reasons that follow, I will grant the District's motion, deny Plaintiffs' cross-motion, and enter judgment in the District's favor.

## I.    BACKGROUND

### A.    Statutory Framework

The IDEA offers states federal funds to assist them in educating disabled children.  *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017).  To obtain funding under the Act, a state must provide every disabled child in its population with a FAPE that includes both "special education" and "related services."  20 U.S.C. §§ 1401(9), 1412(a)(1).  The Act defines "special education" as "specially designed instruction . . . to meet the unique needs" of a disabled child; it defines "related services" to mean any support services or accommodations "required to assist" in that instruction.  § 1401(29), (26); *see also Endrew F.*, 580 U.S. at 390–91.

The Act requires the state to develop and provide an "individualized education program" (IEP) for each disabled student.  § 1401(9)(D).  An IEP is a written comprehensive education plan that identifies the child's present performance levels and future academic goals and outlines concrete steps to assist the student.  §§ 1412(a)(4), 1414(d).  An IEP must be "reasonably calculated to enable . . . progress appropriate in light of the [disabled student's]

2

circumstances." *Endrew F.*, 580 U.S. at 403.  In other words, the educational

program "must be reasonably calculated to enable the child to receive meaningful

educational benefits in light of the student's intellectual potential and individual

abilities." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012) (internal

quotation marks and citation omitted); *see also K.D. ex rel. Dunn v. Downingtown*

*Area Sch. Dist.*, 904 F.3d 248, 254 (3d Cir. 2018).

### B.    Facts

C.G. is autistic and therefore eligible for special education and related

services under the Act.  D.I. 14-2 at 179.  She attended school in the District until

the end of the 2018–2019 school year, when she left to attend White Clay School, a

private school.  D.I. 14-1 at 102.  She attended White Clay for one year.  D.I. 14-1

at 102.  In the summer before the 2020–2021 school year, C.G.'s parents emailed

the District, stating that they might enroll C.G. in a District school and asking for

an updated IEP.  D.I. 14-1 at 102.  The District scheduled a series of psychological,

speech/language, and occupational therapy evaluations that began on July 21 and

ended on August 11.  D.I. 14-1 at 103.  The District's behaviorist also emailed

White Clay, requesting additional information regarding C.G.'s behavioral data.

D.I. 14-1 at 104.

C.G.'s IEP meeting took place on September 2.  D.I. 14-2 at 179.  The

proposed IEP described the results of C.G.'s evaluations and set seven goals for

C.G.  D.I. 14-2 at 179–206.  The IEP supported these goals through services such as direct instruction and counseling.  D.I. 14-2 at 179–206.  The first four goals related to C.G.'s academic performance and the last three targeted her social and behavioral development.

### 1.  Goals 1 & 2: Math Calculation and Number Sense

C.G.'s evaluations showed that she needed support in mathematics, as she scored in the "low" range in five out of six tested categories and "below average" in the sixth.  D.I. 14-2 at 183.  The IEP's first two goals were to improve C.G.'s performance in math calculation accuracy from 16% to 60% and to improve her success rate in number sense exercises from 0/5 to 3/5.  D.I. 14-2 at 192–94.  To support these goals, the IEP called for C.G. to receive direct instruction in math calculation and number sense five times per school week for 25 minutes each session.  D.I. 14-2 at 192–94.  Direct instruction would take place in her special education classroom.  D.I. 14-2 at 192–94.  C.G. would also be provided with positive reinforcement (per C.G.'s behavior support plan), breaks, and consistent and clear routines.  D.I. 14-2 at 192–94.

### 2.  Goals 3 & 4: Reading Fluency and Comprehension-Text-Based Writing

C.G. scored "below average" in reading comprehension and fluency.  D.I. 14-2 at 183.  The IEP set as C.G.'s goal for reading comprehension to improve her accuracy in answering inferential questions from 36% to 70%.  D.I. 14-2 at 195.

The District proposed a reading-fluency goal of 110 words per minute with 98% accuracy. D.I. 14-2 at 195. Under the IEP, C.G. was to receive direct instruction in the language arts every school day for 30 minutes in her special education classroom. D.I. 14-2 at 195.

### 3. Goals 5, 6 & 7: Self-Regulation, Peer Interaction, and Application of Learned Skills

To achieve C.G.'s goal of moving from demonstrating age-appropriate social skills with adult assistance to demonstrating those skills independently, the IEP required the District to provide C.G. with direct instruction in peer interaction three times a day (five minutes each session) in the general education setting and once daily (15 minutes each session) in the special education setting. D.I. 14-2 at 200–01. She would also receive direct instruction in self-regulation (35 minutes a day) with a goal of decreasing the time spent out of her general education classroom. D.I. 14-2 at 198–99. In addition to direct instruction in self-regulation, the District would support C.G.'s progress through the use of, among other things, a visual schedule, extra time to prepare for transitions, and leadership opportunities. D.I. 14-2 at 197–98. Finally, the District set a goal of improving C.G.'s application of learned skills from 0/5 to 4/5 times when prompted, supported by 45 minutes of direct instruction a day. D.I. 14-2 at 202–03.

### 4.   Additional Support for C.G.

Under the IEP, C.G.'s progress toward all seven of these goals would be
supported by group and individual counseling for four hours a month in her general
and special education environments, as well as occupational therapy and
speech/language pathology services on a consultative basis.  D.I. 14-2 at 204.  The
IEP also included a draft behavior support plan (BSP) that continued the services
provided by White Clay—many of which were also incorporated into other
portions of the IEP—until the District could complete its own data collection and
observation of C.G. in her new educational environment.  D.I. 14-2 at 211–13.
The IEP also took into account that some days C.G. would need more support than
others; thus, the amount of time C.G. would spend in her general education
classroom was flexible within certain boundaries.  The IEP placed C.G. in a "B"
setting, meaning that C.G. would spend at least 40% and no more than 79% of her
day in her general education classroom.  D.I. 14-2 at 179–206.

### C.   Procedural History

Two days before the District's September 16, 2020 start date, C.G.'s parents
returned the signed IEP to the District with a note stating: "[We] agree that [C.G.]
is in need of special education services and agree that she requires services under
IDEA; however, [we] do not agree that the program offered by the District is
appropriate and therefore, per [our] Aug. 5, 2020 notice to the District, [C.G.] will

attend White Clay School for the 2020–2021 school year." D.I. 14-1 at 106.
C.G.'s parents then filed a due process complaint with the Delaware Department of
Education, alleging that the District denied C.G. a FAPE under the IDEA and
requesting reimbursement for C.G.'s tuition at White Clay for the 2020–2021
school year. D.I. 14-1 at 100–01. After a three-day hearing, an independent panel
(the Panel) found that the District provided C.G. with a FAPE for the 2020–2021
school year. D.I. 14-1 at 101–12. The Panel therefore denied Plaintiffs' request
for tuition reimbursement. D.I. 14-1 at 112.

## II.    Jurisdiction and Standard of Review

I have jurisdiction over Plaintiffs' IDEA, § 504, and ADA claims pursuant
to 28 U.S.C. § 1331. I have jurisdiction over Plaintiffs' state law claims pursuant
to 28 U.S.C. § 1367.

When reviewing an appeal from a state administrative decision under the
IDEA, federal district courts conduct a modified *de novo* review. *S.H. v. State-
Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003). Under this
standard, the district court makes its own findings by a preponderance of the
evidence but also gives "due weight" to the findings made in the administrative
proceeding. *Id.*; *see also D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir.
2010). "Factual findings from the administrative proceedings are to be considered
prima facie correct." *State-Operated Sch. Dist. of Newark*, 336 F.3d at 270. And

"[i]f the reviewing court does not adhere to those findings, it is obliged to explain why." *Id.* (citation omitted). "The party challenging the administrative decision bears the burden of persuasion." *Ridley Sch. Dist.*, 680 F.3d at 270.

## III.   DISCUSSION

Plaintiffs seek tuition reimbursement for C.G.'s fifth-grade year at the White Clay School under the IDEA, the Rehabilitation Act, the ADA, and Delaware law. Based on the record, the District offered C.G. a FAPE and Plaintiffs' claim under each of these laws fails.

### A.    The IDEA and Delaware Law Implementing the IDEA

Under the IDEA, parents have a right to tuition reimbursement for a unilateral placement of a student at a private school only if "the student's IEP is inappropriate." *H.L. v. Downingtown Area Sch. Dist.*, 624 Fed. App'x 64, 68 (3d Cir. 2015). "[T]he party seeking relief must show that the public school failed to 'offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.'" *C.F. v. Radnor Twp. Sch. Dist.*, 2019 WL 1227710, at *8 (E.D. Pa. Mar. 14, 2019) (quoting *Endrew F.*, 580 U.S. at 399). "FAPE 'consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the student to benefit from the instruction.'" *M.A. v. Jersey City Bd. of Ed.*, 592 Fed. App'x 124, 128–29 (3d Cir. 2014) (quoting *Ridley*, 680 F.3d at 268–69).

8

"Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." *Endrew F.*, 580 U.S. at 399. If a student was denied a FAPE, the court next considers whether the private school placement was appropriate. *Sch. Comm. of Burlington v. Dept. of Educ. of Massachusetts*, 471 U.S. 359, 370–71 (1985); *Florence Cnty. Sch. Dist. v. Carter*, 510 U.S. 7, 14 (1993).

### 1.    The District Provided C.G. with a FAPE

Plaintiffs argue that C.G.'s IEP was deficient because it (1) was not supported by a comprehensive evaluation of all suspected areas of her social, emotional, and behavioral needs; (2) did not contain measurable and ambitious goals; (3) did not state the amount of special education instruction C.G. would receive; (4) did not provide sufficient special education instruction in math; and (5) did not contain a finalized BSP. D.I. 15-2 at 13.  Plaintiffs argue that because of these deficiencies, the District never offered C.G. a FAPE. *See* D.I. 15-2 at 1, 7, 12, 17.

#### a.    Comprehensive Evaluation

The record shows, and Plaintiffs do not dispute, that the District subjected C.G. to several days of psychoeducational and occupational therapy evaluations. D.I. 14-1 at 103.  These evaluations examined C.G.'s academic, social, emotional, and behavioral needs. *See* D.I. 14-1 at 179–85.  The results appear in the first ten

pages of C.G.'s IEP and the District relied on those results to design for C.G. seven goals. D.I. 14-2 at 182–91. The IEP supported these goals through (1) services designed to help C.G. improve in her weaker areas and (2) accommodations (e.g., providing breaks and allowing additional time for transitions) to address C.G.'s unique behavioral challenges. D.I. 14-2 at 182–91. Plaintiffs do not argue that C.G.'s evaluations deviated from the District's typical procedure when a family requests an updated IEP over the summer, nor do they explain why the evaluations were deficient. And based on the District's IEP—created using the information it gathered about C.G.'s unique needs—I see no basis to find that the District's evaluation of C.G. was deficient.

### b.    Measurable and Ambitious Goals

As stated above, the District's evaluations enabled it to set goals for C.G. to address her weaknesses in mathematics, reading comprehension and fluency, peer interactions, self-regulation, and application of learned skills. The goals were all measurable. C.G.'s goal for math calculation, for instance, targeted improvement from 16% to 60% accuracy. The other six goals were likewise quantifiable. And while Plaintiffs argue that the goals for mathematics did not target mastery level (i.e., 90% correct before moving on to new material) and were less ambitious than the goals that C.G. worked towards at White Clay, the standard for a FAPE is to

enable the student to make meaningful progress in light of her circumstances. That standard is satisfied here.

### c.      Amount of Special Education Instruction

Though the IEP did not give an exact amount of special education instruction for C.G. to receive, it did give a range: C.G. would spend between 40% and 79% of her time inside her regular classroom and the balance of her time in a special education setting. At the same time, within that intentionally flexible framework, the IEP provided some certainty by stating where the District would provide C.G.'s services (e.g., daily direct instruction in math calculation in her special education classroom). I therefore find that the IEP was sufficiently detailed regarding the amount of special education the District would provide for C.G. and that Plaintiffs could make an informed decision about C.G.'s placement.

### d.      Special Education Instruction in Math

The IEP included 25 minutes of direct instruction in math calculation and number sense each school day. Under the plan, C.G. would receive this instruction in her special education classroom and receive the balance of her mathematics instruction in her general education classroom. The District would also support her progress in math through two other goals: self-regulation (35 minutes a day) and application of learned skills (45 minutes a day). Through self-regulation, the District would provide accommodations such as noise-reducing headphones to help

11

C.G. remain in a learning state, and C.G. would learn calming strategies to help her handle her frustrations associated with math. Application of learned skills would help C.G. use the tools the District provided through direct instruction in other areas to help her achieve her goals. This instruction, balanced with the IEP's goal of allowing C.G. to spend time in the general education setting and have opportunities to interact with her neurotypical peers, was not a denial of FAPE.

### e.    Behavior Support Plan

Plaintiffs do not challenge the sufficiency of the BSP, only that it was a draft (i.e., that the school would update the BSP after observing C.G.'s behavior for a few weeks). Although it is true that the IEP included a draft BSP, "draft" is something of a misnomer here. This was not some generic BSP; it was based on the plan that White Clay developed for C.G. over several months at the start of the 2019–2020 school year. D.I. 14-1 at 203–04; D.I. 15-2 at 20 (Plaintiffs stating that the draft BSP was a "restatement of White Clay's behavior plan from the previous school year"). It was in place just a few months before C.G. would have started at the District's school. D.I. 14-1 at 203–04  And Plaintiffs do not point to any deficiency in the BSP as it applied to C.G. at White Clay. The District planned to use the existing BSP for the first few weeks of the school year while collecting data to update C.G.'s BSP. D.I. 14-1 at 203–04. So while the BSP was technically a draft, it was designed to meet C.G.'s unique needs.

The District's plan to update the BSP after observing C.G. in her new learning environment (whether that environment was in person or virtual) was likewise not a denial of FAPE. Testimony from the District's behaviorist, Lauryn Elder, shows that IEPs are not set in stone but are meant to be adapted over time by the IEP Team to meet the needs of the child. *See* D.I. 14-1 at 219. Elder also testified about the importance of gathering behavioral data when a student changed educational environments. She stated that even if White Clay had provided detailed information about C.G.'s behavior in addition to the BSP, she would have evaluated C.G.'s behavior "within [the District's] school[], whether that was virtual or in person." D.I. 14-1 at 216. Elder's testimony emphasized the need to observe C.G. in her environment, or "meet her where she's at in an educational setting," and hold an IEP meeting to "adjust the plan for C.G. in that setting" if necessary. D.I. 14-1 at 216. Notably, White Clay took a similar approach when C.G. started school there; it provided C.G. an initial BSP on October 4, 2019 and altered it on November 4, 2019. D.I. 14-1 at 110. Accordingly, I find that including a draft BSP did not constitute denial of a FAPE.[1]

---

[1] Plaintiffs contend that the District should have collected behavioral data on C.G. during the summer (as it would have had to because C.G.'s parents requested an IEP toward the end of June). C.G.'s parents did not inform the District that she was in summer school, but they argue that the District could have sent "a one sentence email" to discover that fact. D.I. 18 at 1. The District's failure to ask whether C.G. was in summer school does not alter the analysis here. The draft

### f.    The District Offered C.G. a FAPE

Based on my review of the record, I find that C.G.'s IEP consisted of goals and services reasonably calculated to enable C.G. to make progress appropriate in light of her circumstances.  The IEP addressed her weaknesses in math and English by offering direct instruction in the special education classroom.  It provided support for her in the general education classroom as well, including instruction on appropriate peer engagement.  It taught her strategies to keep her in a learning state through self-regulation, and it gave her support and encouragement in applying the skills that she learned to achieve her goals.  All these services were supported by individual and group counseling.  Accordingly, I find that the District offered C.G. a FAPE, and I need not consider whether White Clay was an appropriate placement.

### 2.    The IEP Was Timely

Plaintiffs next argue that the IEP was untimely because the District offered it to C.G. after she had started the school year at White Clay.  D.I. 15-2 at 7. Plaintiffs base their untimeliness argument on two provisions of the IDEA: § 1414(d)(2)(A) and § 1412(a)(10)(C)(ii).  D.I. 15-2 at 10–11.

Section 1414(d)(2)(A) provides:

---

BSP was designed to meet C.G.'s unique needs and to help her make reasonable progress in school.

14

> At the beginning of each school year, each local
> educational agency, State educational agency, or other
> State agency, as the case may be, shall have in effect, for
> each child with a disability in the agency's jurisdiction,
> an individualized education program, as defined in
> paragraph (1)(A).

20 U.S.C. § 1414(d)(2)(A).  Plaintiffs argue, without citing any case law, that "[a]t

the beginning of each school year" refers to the beginning of the school year for

the private school of the parents' choice.  But by its express terms, § 1414(d)(2)(A)

applies only to local educational agencies, state educational agencies, and other

state agencies.  And the IDEA defines "local educational agency" as a "public

board of education or other public authority" that administers or serves public

schools, § 1401(19), and "State educational agency" as the agency primarily

responsible for state supervision of public schools, § 1401(32).  Section

1414(d)(2)(A) requires these agencies (and "other *State* agenc[ies]") to "have in

effect" by "the beginning of each school year" an IEP "for each child with a

disability *in the agency's jurisdiction.*"  Thus, it is clear that the school year

referred to in the statute is the school year for the schools in the particular agency's

jurisdiction—i.e., public schools, not private schools of a parent's choice.

Section 1412(a)(10)(C)(ii) states:

> If the parents of a child with a disability, *who previously
> received special education and related services under the
> authority of a public agency,* enroll the child in a private
> elementary school or secondary school without the
> consent of or referral by the public agency, a court or a

15

> hearing officer may require the agency to reimburse the
> parents for the cost of that enrollment if the court or
> hearing officer finds that the agency had not made a free
> appropriate public education available to the child in a
> timely manner prior to that enrollment.

20 U.S.C. § 1412(a)(10)(C)(ii) (emphasis added).  Seizing on the last clause,

Plaintiffs argue that § 1412(a)(10)(C)(ii) required the District to have provided

them an IEP for C.G. "prior to [her] enrollment" in White Clay.  D.I. 15-2 at 11.

But this provision has no application here because, as the italicized portions of the

quoted language make clear, § 1412(a)(10)(C)(ii) addresses the situation where

parents *remove* their child from a public school and place the child in a private

school.  *See also* 20 U.S.C. § 1412(a)(10)(C)(iii) ("The cost of reimbursement

described in [§ 1412(a)(10)(C)](ii) may be reduced or denied if at the most recent

IEP meeting that the parents attended *prior to removal of the child from the public*

*school*, the parents did not inform the IEP Team that they were rejecting the

placement proposed by the public agency to provide a free appropriate public

education to their child . . . ." (emphasis added)).

Accordingly, I find that the District's IEP for C.G. was not untimely.

### 3.   The Panel's Decision Was Not Based on Inadmissible "Fluid" Testimony

Plaintiffs next fault the Panel for "relying upon the District's testimony at

the hearing that [C.G.'s] placement was fluid."  D.I. 15-2 at 16; *see also* D.I. 15-2

at 5.  According to Plaintiffs, "[a]t the hearing, the District testified that [C.G.'s]

16

placement was 'fluid,' meaning her time in the special education classroom could increase or decrease depending on the level of support [C.G.] or her providers felt she needed during a given day and, critically, without the Parents' consent or even knowledge." D.I. 15-2 at 5.  Plaintiffs, however, do not identify and I am unable to find anywhere in the Panel's decision where the Panel used the word "fluid" or suggested that it relied on testimony to the effect that C.G.'s "time in the special education classroom could increase or decrease depending on the level of support [C.G.] or her providers felt she needed during a given day and, critically, without the Parents' consent or even knowledge."  Moreover, the Panel stated in its "Findings of Fact" section of the decision that the IEP placed C.G. in "a 'B' setting, with [C.G.] served inside the regular classroom greater than or equal to 40% of the day and no more than 79% of the day." D.I. 14-1 at 105.  That finding of fact is supported by the written IEP, which states that "Services [will be] Provided Both in Separate Special Education Classes and Regular Setting" and that the "Student [will be] served inside the regular classroom greater than or equal to 40% of the day and no more than 79% of the day." D.I. 14-2 at 206.  And the Panel stated in its decision that "[t]o the extent that the testimony of various witnesses is not in accord with the findings as stated herein, it is not credited." D.I. 14-1 at 101.  Accordingly, there is no evidence to suggest that the Panel relied on the alleged "fluid" testimony Plaintiffs say was inadmissible.

17

### 4.     Plaintiffs Are Not Entitled to Tuition Reimbursement

Because, as discussed above, Plaintiffs have not pointed to record evidence
that undermines the Panel's decision or establishes that the IEP was inappropriate,
they are not entitled to tuition reimbursement under the IDEA. *Downingtown Area
Sch. Dist.*, 624 Fed. App'x at 68.

### 5.     Plaintiffs Have Waived Their Claims Under Delaware Law

Plaintiffs state in their opening brief's introduction that the District "fail[ed]
to provide [C.G.] with the [FAPE] to which she is entitled under . . . 14 Del.
Admin. C. § 922, *et seq.*" D.I. 15-2 at 1.  Yet nowhere in their opening brief do
Plaintiffs articulate the legal standard for a claim under this portion of the
Delaware Administrative Code, nor do they raise arguments in support of that
claim.  Plaintiffs have therefore waived their claim under 14 Delaware
Administrative Code § 922, *et seq.  See Laborers' Int'l Union of N. Am., AFL-CIO
v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is
waived unless a party raises it in its opening brief, and for those purposes a passing
reference to an issue will not suffice to bring that issue before this court." (internal
quotation marks omitted)).

### B.     Section 504 of the Rehabilitation Act

Section 504 mandates that no disabled person "shall, solely by reason of her
or his disability, be excluded from the participation in, be denied the benefits of, or
be subjected to discrimination under any program that receives federal funds."

*D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 253 n.8 (3d Cir. 2012) (internal

quotation marks omitted).  In the context of special education, § 504 "requires

schools that receive federal financial assistance to provide a free appropriate public

education to each qualified handicapped person who is in the recipient's

jurisdiction." *Id.* (internal quotation marks omitted); 34 C.F.R. § 104.33(a).

Section 504 states that "[i]mplementation of an [IEP] developed in accordance

with the [IDEA] is one means of meeting the standard established" for an

appropriate education.  34 C.F.R. § 104.33(b)(2); *see also D.K.*, 696 F.3d at 253

n.8 ("[O]ur finding that the School District did not deny D.K. a FAPE is equally

dispositive of Plaintiffs' § 504 claim.").

        Here, Plaintiffs base their § 504 claim on a theory identical to their IDEA

claim: namely, that the District failed to provide C.G. a non-deficient FAPE.  D.I.

15-2 at 1.  Plaintiffs do not allege that the District discriminated against C.G. other

than by denying her a FAPE.  *See* D.I. 1; D.I. 15-2 at 1.  And, for the reasons

discussed above, I find that the District provided C.G. with an IEP developed in

accordance with the IDEA and therefore provided her with a FAPE.  Accordingly,

the District has met the standard for an appropriate education under § 504 and

Plaintiffs' § 504 claim fails.

### C.    The Americans with Disabilities Act

The ADA "extends the nondiscrimination rule of [§ 504] to services provided by any public entity (without regard to whether the entity is a recipient of federal funds)." *Jeremy H. by Hunter v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 279 (3d Cir. 1996).  Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.A. § 12132.  Though denial of a FAPE is not the only basis for an ADA claim by a disabled student, "[f]ailure to provide a FAPE . . . generally violates the ADA . . . because it deprives disabled students of a benefit that non-disabled students receive simply by attending school in the normal course—a free, appropriate public education." *CG v. Pennsylvania Dep't of Educ.*, 734 F.3d 229, 235 (3d Cir. 2013).

Like their § 504 claim, Plaintiffs' ADA claim is based solely on their assertion that the District failed to provide C.G. a non-deficient FAPE. *See* D.I. 15-2 at 1.  Plaintiffs do not allege that the District discriminated against C.G. other than by denying her a FAPE. *See* D.I. 1.  For the reasons previously explained, I find that the District did provide C.G. with a FAPE.  Thus, Plaintiffs' ADA claim fails.

20

## IV.    CONCLUSION

For the reasons discussed above, I will grant the District's motion for

judgment on the administrative record and deny Plaintiffs' cross-motion.

The Court will issue an Order and a Judgment consistent with this

Memorandum.


Dated:  *3.21.23*


_____
                          CHIEF JUDGE